UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DERRICK R. OMARO, 92A0608,

                     Plaintiff,

      -vs-

SERGEANT O'CONNELL,

                     Defendant.

_____

**No. 6:14-CV-06209 (MAT)**
**DECISION AND ORDER**

## I.    Introduction

Derrick R. Omaro ("Omaro"), proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, alleging claims of religious discrimination in violation of his First and Fourteenth Amendment rights.[1] Plaintiff and defendant Sergeant O'Connell ("Sergeant O'Connell") have filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. 84. For the reasons set forth herein, Sergeant O'Connell's motion is granted in part and denied in part, and Omaro's motion is denied.

## II.    Factual Background and Procedural History

Omaro commenced this civil rights action pursuant to 42 U.S.C. § 1983 on April 29, 2014, alleging that Sergeant O'Connell, an employee of the New York State Department of Corrections and Community Supervision ("DOCCS"), violated his First Amendment religious freedom rights and his Fourteenth Amendment equal

---

[1] On December 31, 2014, this Court dismissed plaintiff's related claim based on the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.* See doc. 10.

protection rights while Omaro was in the custody of DOCCS and incarcerated at Attica Correctional Facility ("Attica"), in Attica, New York.[2] The following material facts are taken from the parties' submissions in connection with their motions and from the record in the case. See docs. 36, 39, 41, 42.

On July 14, 2013, Omaro, a practicing Muslim, was participating in fasting in association with the Muslim holy month of Ramadan. In 2013, the month of Ramadan spanned the time period from Monday, July 8 through Wednesday, August 7. Observers of Ramadan are expected to fast during daylight hours, sunrise through sunset, on each day of Ramadan. Observers eat a light breakfast before sunrise and one meal after sunset. On July 14, 2013, Omaro received a visit from his wife during daylight, at approximately lunchtime. Sergeant O'Connell observed Omaro eating food during that visit. In Sergeant O'Connell's words, "[b]eing the program sergeant, [he was] very familiar with the Ramadan callout and knew that [Omaro] was participating in the Ramadan fast." Doc. 36 at 31. He therefore "questioned [Omaro] about him eating and [Omaro] told [Sergeant O'Connell] that he was not participating in the fast and could eat what he wanted." Id. Sergeant O'Connell "then had [Omaro]

---

[2] Omaro is currently housed at Great Meadow Correctional Facility in Comstock, New York.

2

removed from the Ramadan callout and made arrangements for him to receive the regular KL[3] feed up trays." Id.

On the evening of July 14, 2013, when Omaro inquired as to why he did not receive his Ramadan fasting meal, he was informed that "per Sergeant D. O'Connell he was removed from the Ramadan [callout] and would not be receiving Ramadan meals." Id. at 13. Omaro alleges that in removing him from the fasting list, Sergeant O'Connell violated his constitutional rights and failed to follow DOCCS policy. According to Omaro, his removal from the Ramadan callout list resulted in his being unable to participate in Ramadan fasting for the remainder of the month.

Omaro filed a grievance on July 14, 2013, which described Sergeant O'Connell's action in removing him from the Ramadan callout list, and alleged that Sergeant O'Connell had a "history of harassing Muslim inmates and [was] known for his hatred of Muslims." Doc. 36 at 22. Omaro further alleged that "it [was] well documented that for whatever reason a Muslim misses a day of fasting, he can make that day up." Id. Omaro maintains, and Sergeant O'Connell has not disputed, that the Muslim faith allows a member to resume his fast even where that member broke his fast during Ramadan, and also allows a member to "make up" days of fasting that were missed. By way of relief, Omaro requested that

---

[3] At the time of the incident, Omaro was "on keeplock [KL], which meant that he was confined to his cell." Doc. 39-3 [O'Connell dec.] at ¶ 17.

DOCCS "confirm that there [was] no provision in DOCCS policy to deny an inmate 'Muslim' practice and, upon confirmation . . ., [that Omaro] be returned to all benefits of said . . . practices." Id.

Omaro's grievance was initially denied by the Inmate Grievance Program Committee ("IGRC") on July 19, 2013. The denial explained that, per Sergeant O'Connell, Omaro had been removed from the Ramadan callout list because Sergeant O'Connell had observed Omaro breaking fast and Omaro stated he was not participating in the fast. In a new grievance letter dated July 19, 2013, Omaro stated, "I do not deny that I had lunch with my wife on said day, however, what seems to be at issue here is not whether I was seen having lunch with my wife, rather [Sergeant] O'Connell's deprivation on my religious practice just because he feels he has the authority." Doc. 39-4 at 286.

At his deposition, Omaro also testified that he had a chronic medical condition for which he had to take medication three times per day, and that when he took medication he "[had] no other choice but to drink sustenance or fill [his] belly." Doc. 39-4 at 144-45. In his statement of appeal from his first grievance, Omaro asserted that Sergeant O'Connell had "fabricated" the story that Omaro stated he was not participating in fasting; Omaro alleged, "Why would I tell him that [that he was not fasting] and not the Imam who has the authority only to change my religion and/or religious

practices." Doc. 36 at 32. Omaro has never conceded that he told Sergeant O'Connell that he was not participating in Ramadan fasting.

Omaro appealed the denial of his first grievance to the Superintendent of Attica, who denied Omaro's appeal on July 25, 2013. The denial "advised" Omaro that "in accordance with CORC LKV 3878-3880-03[4] . . . when [] inmates break the fast they are appropriately removed from the [R]amadan callout." Id. Omaro was also advised that "CORC dispositions have the effect of directives" and that "when an employee is performing their job duties as required that is not considered harassment." Id. Omaro appealed the Superintendent's decision on July 31, 2013.

On January 29, 2014, in response to Omaro's latest appeal, the CORC issued a decision that Omaro's grievance was "unanimously accepted in part." Doc. 36 at 33. That decision stated, as relevant here:

> Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted in part.
>
> CORC notes that this matter has been properly investigated by the facility administration. CORC asserts that Sgt. O. should not have removed [Omaro] from the list of Ramadan participants and that [his] break in fast should have been reported to the facility Imam or if absent the facility coordinating Chaplain. The Imam or Chaplain will subsequently meet with the Deputy Superintendent for Programs for appropriate action to be

---

[4] This is an apparent reference to DOCCS' Central Office Review Committee's ("CORC") disposition on a separate grievance numbered 3878/3880-03. It does not appear that Omaro was involved in that grievance proceeding.

> taken. CORC notes that the facility administration has taken appropriate corrective action to remind staff of the importance to follow the Protocols for Ramadan 2013 which was issued to all Superintendents . . . on [June 24, 2013]. . . .
>
> With respect to [Omaro's] appeal, CORC notes that its prior decision in LKV-3878/3880-03 was superseded by revised department policy.

Id.

Omaro's motion papers include various correspondence sent among DOCCS personnel. In a May 28, 2013 memorandum to all DOCCS superintendents, the Deputy Commissioner of Program Services advised:

> In regard to offenders missing meals during Ramadan, it is expected that offenders will be referred to the facility Imam (designated Chaplain in the absence of the Imam). Afterwards, the Chaplain will meet with the Deputy Superintendent for Program Services for appropriate action to be taken. *No offenders are to be removed from Ramadan without the consent of the Deputy Superintendent for Program Services.*

Doc. 36 at 39 (emphasis added).

A June 24, 2013 memorandum entitled "Protocols for Ramadan 2013," also addressed to all DOCCS superintendents, attached the "Guidelines for Ramadan; Ramadan Activities in NYS DOCCS" ("the Ramadan Guidelines"). Doc. 36 at 41-43. In relevant part, the Ramadan Guidelines provided that "[w]hen the fast is legitimately broken, the participant must make up the missed time prior to the start of the next Ramadan session." Id. at 42. Under a heading entitled "Areas of Concern," the Ramadan Guidelines provided, among other things:

6

2.   Offenders who are ill are to be referred to the designated Muslim Chaplain for counseling and are not to be arbitrarily removed from the list of Muslims participating in the fast. . . .

7.   Matters of further concern should be referred to the facility Muslim Chaplain or the Director of Ministerial, Family, and Volunteer Services.

Id. at 43.

Omaro also submitted email correspondence, the authenticity of which Sergeant O'Connell does not dispute, which took place between DOCCS personnel regarding Omaro's grievance. In a November 30, 2013 email, Dennis (whose last name is redacted), referred Omaro's grievance to another DOCCS employee, Morris, and noted that the CORC decision on Omaro's appeal "reference[d] an old CORC [LKV 3878-3880-03]." Id. at 37. Morris replied, in part, "please note, [Sergeant O'Connell's] actions were not in compliance with policy." Id. In his declaration, Sergeant O'Connell states that he "was aware of the DOCCS Ramadan protocol for 2013, but [he] was not aware on July 14, 2013 that the policy was meant to apply to a situation where [he] saw [Omaro] eating when he should have been fasting and after [Omaro] told [O'Connell] that he was not participating in the Ramadan fast." Doc. 39-3 at ¶ 34.

**III. Standard of Review**

Summary judgment is appropriate where the court determines "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c). The court must view all facts in the light most

7

favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." See Scott v. Harris, 550 U.S. 372, 380 (2007). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e). To meet this burden, "a plaintiff must come forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case. See Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001).

## IV. Discussion

Reading Omaro's complaint liberally, it states two claims: Omaro contends that (1) Sergeant O'Connell violated his First Amendment rights under the free exercise clause of the First Amendment when he removed Omaro from the Ramadan callout list; and (2) Sergeant O'Connell discriminated against him on the basis of his religion of Islam. The Court construes the second claim as one brought under the equal protection clause of the Fourteenth Amendment. See, e.g., Meadows v. Lesh, 2010 WL 3730105, *3 (W.D.N.Y. Sept. 17, 2010) ("Although 'religious discrimination

challenges are rarely brought under the equal protection clause, thanks to the existence of the First Amendment,' <u>United States v. Brown</u>, 352 F.3d 654, 669 n.18 (2d Cir. 2003), '[i]t is unclear whether plaintiffs are attempting to state a claim under the Free Exercise Clause or the Equal Protection Clause. The Court has therefore considered the Complaint under both.'").

Sergeant O'Connell argues that, for purposes of Omaro's free exercise claim, (1) Sergeant O'Connell's actions were reasonably related to a legitimate penological purpose; and (2) he is entitled to qualified immunity; and for purposes of Omaro's equal protection claim, (3) there is no evidence that Sergeant O'Connells actions were taken with discriminatory intent.

### A.   Omaro's Free Exercise Claim

The Second Circuit has held that "[t]o prevail on a First Amendment [free exercise] claim, a plaintiff must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest." <u>Barnes v. Furman</u>, 629 F. App'x 52, 55 (2d Cir. 2015) (citing <u>Holland v. Goord</u>, 758 F.3d 215, 220–23 (2d Cir. 2014); <u>Ford v. McGinnis</u>, 352 F.3d 582, 597–98 (2d Cir. 2003)). "Defendants may assert a defense of qualified immunity to such a claim, but they must show that their conduct 'does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" Id. (citing Zahrey v. Coffey, 221 F.3d 342, 347 (2d Cir. 2000)).

### 1. Reasonable Relation to Legitimate Penological Interests

Sergeant O'Connell argues that Omaro's free exercise claim must be dismissed because the removal of Omaro from the Ramadan callout list was reasonably related to legitimate penological interests. "Under the First Amendment, . . . a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.'" Redd v. Wright, 597 F.3d 532, 536 (2d Cir. 2010) (internal quotation marks omitted) (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)); see also Barnes v. Furman, 629 F. App'x 52, 56 (2d Cir. 2015) ("Taken together, our earlier decisions have clearly established that prison officials may not prohibit a sincere religious practice without some legitimate penological interest."). This standard is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone, 482 U.S. at 349.

As Sergeant O'Connell points out, the rule requiring a legitimate penological interest is equally applicable to individual actions of prison personnel as it is to generally-applied policies or regulations. See Salahuddin v. Goord, 467 F.3d 263, 274 n.4 (2d Cir. 2006) ("An individualized decision to deny a prisoner the

ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise."). Moreover, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

In Turner v. Safley, 482 U.S. 78, 90 (1987), the Supreme Court explained that several factors must be considered when evaluating the validity of prison regulations, or, in this case, Sergeant O'Connell's particular action. Pursuant to Turner, (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) courts should assess "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) courts should consider available alternatives: "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." Id.; see also Johnson v. Goord, 445 F.3d 532, 535 (2d Cir. 2006) (explaining Turner).

In <u>O'Lone</u>, 482 U.S. at 348, the Supreme Court identified three justifications it considered "valid penological objectives" – "deterrence of crime, rehabilitation of prisoners, and institutional security." Subsequent jurisprudence from lower courts has held that cost can constitute a legitimate penological interest in certain circumstances. See, e.g., <u>McLenithan v. Williams</u>, 2016 WL 1312314, *8 (D. Or. Apr. 4, 2016) ("The legitimate penological interests of cost control justify the decision not to provide kosher meals to non-Jewish inmates."); <u>Troy v. Kuhlmann</u>, 1999 WL 825622, *14 (S.D.N.Y. Oct. 15, 1999) ("Defendants have a legitimate penological objective – to ensure that the State only absorb the cost of legal mail and not all correspondences – for checking the addressee of Troy's letter."). Case law discussing the specific issue presented here tends to address cost in terms of dietary needs of numerous inmates as opposed to the cost of one or few meals. See, e.g., <u>Sefeldeen v. Alamaida</u>, 238 Fed. App'x 204, 206 (9th Cir. 2007) ("Here, the legitimate governmental interest is to reasonably accommodate thousands of inmates' religious dietary needs while also considering budgetary, staff, and security limitations."). The <u>Turner</u> Court itself did not discuss to what extent cost saving can be a legitimate government interest, but stated that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence

12

that the regulation does not satisfy the reasonable relationship standard." 482 U.S. at 91.

Sergeant O'Connell contends that "[t]here was no need for [Omaro] to receive the more expensive Ramadan meal, nor [was] there need for the administrative effort necessary to deliver the meal." Doc. 39-5 at 11; doc. 39-3 at ¶ 25. Sergeant O'Connell's argument therefore identifies two penological interests which he asserts are legitimate and justified his removal of Omaro from the Ramadan callout list:  expense and administrative effort. The question is whether, under the Turner test, these penological interests were "legitimate" and whether they were "reasonably related" to Sergeant O'Connell's action.

With respect to the first Turner factor, as for Sergeant O'Connell's contention that "administrative effort" was saved due to his action, the Court finds no valid, rational connection between this alleged penological interest and his action. The Ramadan protocol and guidelines establish that a prison-wide Ramadan meal plan had already been implemented; therefore Omaro and other inmates were already scheduled to have meals before sunrise and after sunset. It strains credulity that changing Omaro's meal plan from two-per-day to three-per-day actually saved any administrative effort, where prison personnel were already responsible for administering both categories of meal plans to inmates in the facility. Moreover, because Omaro was switched to a

13

three-per-day from a two-per-day meal plan, the new plan would arguably result in *more* administrative effort with one additional meal per day. Regardless, any effort saved would be de minimis, especially considering that Omaro was already properly on the list of Ramadan fasting inmates and, due to Sergeant O'Connell's action, had to be removed.

The Court finds that there was, at a minimum, a "valid, rational connection" between Sergeant O'Connell's action and the penological interest of cost. See Turner, 482 U.S. at 90. It is conceivable that placing Omaro back on the regular, three-meal-per-day meal plan was less expensive than keeping him on the two-meal-per-day Ramadan fasting plan for the remainder of the month. However, the Court emphasizes here that this relation is merely conceivable, and not necessarily likely. Tellingly, Sergeant O'Connell has put forth no actual *evidence* of exactly how much cost savings resulted from his action in removing Omaro from the Ramadan callout list; he simply states, in conclusory fashion, that Ramadan meals were "more expensive." Doc. 39-3 at ¶ 25.

The Court notes Sergeant O'Connell's argument that, because Omaro testified that he had a medical condition requiring him to eat or drink three times per day, the valid penological interest of cost-savings justified removing him from the Ramadan callout list. See doc. 39-5 at 12 (citing doc. 39-4 [Omaro's deposition] at 64). In so arguing, Sergeant O'Connell attempts to analogize this case

14

to Keitt v. T. Hawk, 2015 WL 1246058 (N.D.N.Y. Mar. 18, 2015). In
Keitt, the plaintiff wanted to participate in *both* regular meals
three times per day, *and* extra Ramadan fasting meals. The Court
held that "[a] policy which prohibits mixing different types of
meal plans is also rationally related to the legitimate penological
interest in the *orderly and cost-effective provision of nutritional
meals for a substantial number of inmates*." Id. at *14 (emphasis
added).

Sergeant O'Connell's argument on this point fails for at least
four reasons. First, Sergeant O'Connell has not stated that he was
aware that Omaro had any such medical condition *at the time he
removed Omaro from the Ramadan callout list*; therefore this was not
a factor in his decision to deny Omaro Ramadan fasting meals.
Second, Keitt is not analogous because here, unlike in Keitt, Omaro
was enrolled *only* in Ramadan fasting meals and he was removed from
that list and instead placed on regular meals; thus, no "mixing" of
meal plans occurred. Third, and relatedly, Sergeant O'Connell's
argument mischaracterizes Omaro's testimony; he did not testify
that he eats three times per day, *including during Ramadan*, due to
his medical condition. He testified that he, as well as all of the
other practicing Muslims in prison, *generally* received different
food than other inmates, three times per day. But he never
testified that he received *two meal plans* at once during Ramadan.
See doc. 39-4 [Omaro's deposition] at 64. Finally, DOCCS' 2013

Ramadan Guidelines explicitly provided that "[o]ffenders who [were] ill [were] to be referred to the designated Muslim Chaplain for counseling and [were] not to be arbitrarily removed from the list of Muslims participating in the fast." Doc. 36 at 43. Therefore, the Court does not accept Sergeant O'Connell's argument that he was justified in removing Omaro from the Ramadan callout list because he had a chronic medical condition.

The second Turner factor requires the Court to assess "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. In this case, because the prison controlled Omaro's meals, he had no "alternative means" of exercising his right to Ramadan fasting and the specially-timed meals associated with that observance. See Jones v. Hobbs, 2010 WL 3909979, *4 (E.D. Ark. Sept. 13, 2010), report and recommendation adopted, 2010 WL 3909951 (E.D. Ark. Oct. 1, 2010) (holding that plaintiff had no "significant alternative means" of expressing his religious beliefs where defendants denied him his religious diet). Indeed, Omaro has attested that because of Sergeant O'Connell's action, he was unable to participate in Ramadan fasting for the remainder of that month in 2013. The second Turner factor thus weighs in Omaro's favor.

Pursuant to the third Turner factor, the Court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison

16

resources generally." 482 U.S. at 90. This factor relates to Sergeant O'Connell's "administrative effort" justification, which the Court has already found lacked a rational connection to O'Connell's action. In this case, the impact of allowing Omaro to stay on the Ramadan callout list would have been minimal, because he was *already on it*. Cf. Muhammad v. San Joaquin County Jail, 2006 WL 1282944, *7 (E.D. Cal. May 10, 2006), report and recommendation adopted, 2006 WL 2082249 (E.D. Cal. July 25, 2006) (holding that "no legitimate penological interest [had] been advanced which would justify the refusal to provide bag meals to eat after sundown during Ramadan to Muslim prisoners who request them" because "the record reveal[ed] that the [jail] [already] provide[d] meals to eat after sundown during Ramadan."). Thus, the third Turner factor also weighs in Omaro's favor.

Finally, under the fourth Turner factor, the Court must consider whether alternatives to Sergeant O'Connell's action were available. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." 482 U.S. at 90. This factor also weighs in Omaro's favor. An "obvious, easy alternative[]" existed to Sergeant O'Connell's action: he could have simply not removed Omaro from the Ramadan callout list. This alternative, quite significantly, would have *complied with DOCCS policy* on Ramadan, and would have cost the

17

prison no additional money (over that of what it had already budgeted for Ramadan meals) and no additional effort. See id. ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."). 482 U.S. at 91.

Consideration of the Turner factors, therefore, leads to the conclusion that Sergeant O'Connell has failed to advance a legitimate penological interest sufficient to justify his removal of Omaro from the Ramadan callout list. See Wall v. Wade, 741 F.3d 492, 502 (4th Cir. 2014) ("Wall's right to participate in Ramadan was clearly established, and when the defendants abridged this right without first satisfying Turner's reasonableness test, they subjected themselves to the potential for liability."). Accordingly, Sergeant O'Connell's motion for summary judgment on this claim is denied and Omaro's motion for summary judgment is granted. Because the material facts relevant to this determination are not in dispute, Omaro's motion for summary judgment with respect to his free exercise claim is granted. The only remaining issue for consideration regarding that claim is qualified immunity.

### 2.  Qualified Immunity

Sergeant O'Connell contends that he is entitled to qualified immunity, arguing specifically that he believed that Omaro was not

18

participating in Ramadan fasting, and because this belief was objectively reasonable, he is entitled to qualified immunity. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Zahra v. Town of Southold, 48 F.3d 674, 686 (2d Cir. 1995). A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "drawing all inferences most favorable to, the plaintiff[]," a reasonable jury "could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." Lee v. Sandberg, 136 F.3 d 94, 102 (2d Cir. 1997) (citations omitted).

Initially, the Court notes that a Muslim inmate's right to participate in Ramadan fasting was clearly established at the time of the incident. See Ford, 352 F.3d at 597 (holding that Muslim inmate's right to "Eid ul Fitr feast, held once a year in conjunction with a daylong celebration marking the successful completion of Ramadan" was clearly established); Lee v. Wenderlich, 2006 WL 2711671, *11 (W.D.N.Y. Sept. 21, 2006) (citing Smith v. Violi, 1995 WL 150465, *3 (N.D. Cal. Mar. 31, 1995) ("This court therefore finds, as a matter of law, that the law requiring the

availability of after-dark kosher meals during the Islamic holy month of Ramadan to Muslim prisoners who request them is clearly established.")).

The next question is whether, in light of the surrounding facts and circumstances, it was objectively reasonable for Sergeant O'Connell to believe that summarily removing Omaro from the Ramadan callout list did not violate Omaro's constitutional rights. See Lee, 136 F.3d at 102 (noting that defendant is entitled to summary judgment only where no reasonable jury "could conclude that it was objectively unreasonable for the defendant[] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.") (internal quotation marks omitted). According to Sergeant O'Connell, he witnessed Omaro eating lunch with his wife and Omaro informed O'Connell that he, Omaro, was not participating in Ramadan fasting. For the reasons discussed below, the Court finds that regardless of whether Omaro told Sergeant O'Connell that he was not participating in fasting, Sergeant O'Connell's behavior was objectively unreasonable.

In Ford v. McGinnis, 352 F.3d 582, 584 (2d Cir. 2003), the defendants, all DOCCS employees, denied the plaintiff one meal: "the Eid ul Fitr feast, held once a year in conjunction with a daylong celebration marking the successful completion of Ramadan." The feast, which according to Muslim religion is to be held within three days of the end of Ramadan, was postponed for approximately

a week that year at Downstate Correctional Facility to give inmates the opportunity to eat with their families. Id. at 585. The plaintiff was denied participation because he was housed in SHU and because, according to religious authorities at DOCCS, the feast lost religious significance once moved more than three days beyond Ramadan. Id. at 587. On summary judgment, the district court relied on the religious authorities and held that the plaintiff's "religious beliefs were not infringed because the feast, having been moved beyond the three days following the close of Ramadan, no longer carried any objective religious significance." Id. at 586. With regard to qualified immunity, the district court held that "it was objectively reasonable for [defendants] to believe that their refusal to provide Ford the Eid ul Fitr feast did not violate [the plaintiff's] constitutional rights." Id.

On appeal, the Second Circuit reversed, and specifically with regard to qualified immunity, held that the defendants' belief was *not* objectively reasonable because "the proper inquiry was always whether Ford's belief was sincerely held and '*in his own scheme of things, religious*.'" Id. at 598 (emphasis in original) (citing Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984). The Second Circuit noted that, in so holding, it did "not suggest that religious authorities can never be employed in assisting prison officials in making [the] determination" whether a prisoner's beliefs were sincerely held. Id.

21

In this case, Sergeant O'Connell had a specific familiarity with the Ramadan fasting protocols. In a memorandum produced during the investigation of Omaro's grievance, he stated, "Being the Program Sergeant, I am very familiar with the Ramadan callout and knew that [Omaro] was participating in the Ramadan fast." Doc. 36 at 31. In his submissions on summary judgment, Sergeant O'Connell states that he "was aware of the DOCCS Ramadan protocol for 2013, but [he] was not aware on July 14, 2013 that the policy was meant to apply to this situation where [he] saw [Omaro] eating when he should have been fasting and after [Omaro] told [Sergeant O'Connell] that he was not participating in the Ramadan fast." Doc. 39-3 at ¶ 34.

As Omaro argues, factoring into the reasonableness analysis are the Ramadan protocols and guidelines issued to prison officials prior to Ramadan 2013. The protocols, with which Sergeant O'Connell was fully familiar in his position as program sergeant, explicitly stated that "[n]o offenders [were] to be removed from Ramadan without the consent of the Deputy Superintendent for Program Services." Doc. 36 at 39. The Ramadan Guidelines specifically provided that "[w]hen the fast is legitimately broken, the participant must make up the missed time prior to the start of the next Ramadan session." Id. at 42. The Ramadan Guidelines went on to state that matters of further concern were to be relayed to the

facility Muslim Chaplain or the Director of Ministerial, Family, and Volunteer Services.

Thus, the Ramadan protocols and guidelines put DOCCS personnel, including Sergeant O'Connell, on notice that (1) an inmate might break his fast, and in such a situation, the inmate could continue participating in Ramadan fasting by make up the missed time; (2) removal of an inmate from the Ramadan callout list was not to be done without consent of the Deputy Superintendent for Program Services; and (3) issues in need of clarification were to be presented to DOCCS religious personnel. See, e.g., Muhammad, 2006 WL 1282944, at *7 ("In order to ascertain the reasonableness of each defendants conduct, it is first necessary to ascertain whether each defendant has sufficient notice of the alleged violations of plaintiff's constitutional rights so as to create a duty to inquire whether plaintiff's religious dietary needs were being met.").

The Court recognizes that a violation of DOCCS policy does not result in a per se constitutional violation. See Rivera v. Madan, 2013 WL 4860116, *8 n.7 (S.D.N.Y. Sept. 12, 2013) ("A violation of internal policies and procedures does not by itself give rise to liability under Section 1983.") (emphasis added). However, violation of policy is relevant to the analysis of whether a defendant's belief was objectively reasonable for purposes of qualified immunity. Given the content of the protocols and

23

guidelines, the undisputed fact that Sergeant O'Connell violated them when he unilaterally removed Omaro from the Ramadan callout list, and Sergeant O'Connell's position as program sergeant, his declaration that he "was not aware on July 14, 2013 that the policy was meant to apply to this situation" is belied by the record.

As the Second Circuit noted in Ford, "[b]alanced against the desire 'to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury' is the need 'to hold responsible public officials exercising their power in a wholly unjustified manner.'" Ford, 352 F.3d at 597 (quoting Duamutef v. Hollins, 297 F.3d 108, 111 (2d Cir. 2002)). The Court finds that, considering all of the facts and circumstances established by the record, Sergeant O'Connell's action was objectively unreasonable and he exercised his power in an unjustified manner.

Accordingly, Sergeant O'Connell is not entitled to qualified immunity and his motion for summary judgment on this ground is denied. See, e.g., Ippolito v. Goord, 2012 WL 4210125, *18 (W.D.N.Y. Sept. 19, 2012) ("[T]he Court finds, as a matter of law, that [defendant's] belief that his acts were constitutional was objectively unreasonable."); see also Reischauer v. Jones, 2005 WL 2045833, *4 (W.D. Mich. Aug. 24, 2005); Washington v. Garcia, 977 F. Supp. 1067, 1074 (S.D. Cal. 1997). This case will be referred to

Magistrate Judge Michael J. Roemer for a settlement conference on the issue of damages related to Omaro's free exercise claim.

**B.   Omaro's Equal Protection Claim**

Sergeant O'Connell's final argument is that Omaro has not established that O'Connell acted with discriminatory intent, which is elemental to an equal protection religious discrimination claim. "While comparators are not required, traditional equal protection plaintiffs must still allege facts supporting a plausible inference that 'discriminatory intent was a motivating factor' in order to state an equal protection claim." White v. City of N.Y., 2016 WL 4750180, *6 (S.D.N.Y. Sept. 12, 2016) (citing Okin v. Village of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 438 (2d Cir. 2009)). "Conclusory allegations of . . . plaintiff's personal belief of discriminatory intent [are] insufficient." Nash v. McGinnis, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008).

Omaro's complaint states the conclusory allegation that Sergeant O'Connell "intentionally discriminated against [him] because [he was] a practicing Muslim." Doc. 1 at 5. It is not entirely clear from this language whether Omaro meant to allege an equal protection claim, or whether any such claim as stated against Sergeant O'Connell was merely duplicative of Omaro's free exercise claim. In any event, as Sergeant O'Connell points out, when pressed as to whether he could point to evidence of specific instances of O'Connell's discrimination against Muslims, Omaro stated that the

"only evidence [he had was] the evidence that pertains to [him]."
Doc. 39-4 at 28. Omaro later testified: "I can't honestly say if he
discriminated against Muslims. But I can tell you he discriminated
against me through his actions." Id. at 126.

Therefore, to the extent that Omaro's complaint attempts to
make out an equal protection claim, for purposes of summary
judgment, Omaro has failed to establish that Sergeant O'Connell
acted with the requisite discriminatory intent to support such a
claim. Accordingly, the Court grants Sergeant O'Connell's motion
for summary judgment as to Omaro's equal protection claim and this
claim is dismissed with prejudice. See Nash, 585 F. Supp. 2d at
462.

## V. Conclusion

For the foregoing reasons, Sergeant O'Connell's motion for
summary judgment (doc. 39) is granted in part and denied in part
and Omaro's motion for summary judgment (doc. 36) is granted in
part and denied in part. It is hereby

**ORDERED** that with regard to Omaro's Fourteenth Amendment equal
protection claim, Sergeant O'Connell's motion for summary judgment
(doc. 39) is granted and Omaro's motion for summary judgment (doc.
36) is denied, and the claim is therefore dismissed with prejudice;

**ORDERED** that with regard to Omaro's First Amendment free
exercise claim, Sergeant O'Connell's motion for summary judgment
(doc. 39) is denied and Omaro's motion for summary judgment

(doc. 36) is granted, and the Court finds Sergeant O'Connell liable as to this claim; and

**ORDERED** that this case is referred to Magistrate Judge Michael J. Roemer pursuant to 28 U.S.C. § 636(b)(1) for a settlement conference on the issue of damages related to Omaro's free exercise claim.

**ALL OF THE ABOVE IS SO ORDERED.**

**S/Michael A. Telesca**
_____
     HON. MICHAEL A. TELESCA
United States District Judge

Dated:     November 4, 2016
           Rochester, New York.